UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 15-81782-CIV-MARRA / MATTHEWMAN

KIM PETER TILLMAN,

       Plaintiff,

vs.

ADVANCED PUBLIC SAFETY, INC.
and TRIMBLE NAVIGATION, LTD.,

       Defendants.

_____ /

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT**

     Plaintiff, Kim Peter Tillman ("Mr. Tillman"), pursuant to Fed. R. Civ. P. 56 and S.D. Fla. Local Rule 7.1, hereby responds in opposition to the Motion for Final Summary Judgment [DE 136] filed by Defendants, Advanced Public Safety, Inc. ("APS"), and Trimble, Inc. ("Trimble"). In support, Mr. Tillman states as follows:

**SUMMARY OF ARGUMENT**

     Defendants move for summary judgment despite the fact their own Rule 30(b)(6) designees conceded that Defendants made false statements to customers regarding a product known as "SmartConnect" and that Mr. Tillman followed the proper policies in reporting that unlawful conduct. Defendants' motion focuses on the passage of time between Plaintiff's initial complaint about the deceptive sales practices and his ultimate termination, while ignoring the record evidence that Mr. Tillman suffered various adverse employment actions climaxing with his eventual termination. Trimble's Human Resources Manager put it best: the Company was playing "the waiting game per the attorneys" regarding Mr. Tillman after he complained about the legality of Defendants' sales practices, age discrimination, and unpaid commissions.

     In support of their Motion for Final Summary Judgment, Defendants filed the Affidavit of Scott Mellett where Mr. Mellett states that "I made the decision to terminate Peter Tillman," which is directly contradictory to his sworn deposition testimony that "It was <u>not</u> my decision." Given these genuine issues of material fact, and the plethora of material fact issues discussed below; summary judgment should be denied.

1

**LEGAL STANDARD**

Summary judgment is appropriate *only when* "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of demonstrating that there is no genuine dispute as to any material fact lies on the party seeking summary judgment. *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368 (11th Cir. 1982). In ruling on a summary judgment motion, the Court is required to "view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." *Id.* Thus, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court must deny summary judgment."[1]

"In reviewing whether the nonmoving party has met his burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Goree v. Winnebago Indus., Inc.*, 958 F.2d 1537, 1539–40 (11th Cir. 1992) (internal quotations and citations omitted).

**LEGAL ARGUMENT & MEMORANDUM OF LAW**

**I.    There are genuine issues of material fact regarding whether Plaintiff was retaliated against in violation of the Florida's Whistleblower Act.**

Count I of Plaintiff's Second Amended Complaint (the "Complaint") is for Defendants' violations of Florida Statutes, Section 448.102, the Florida Whistleblower Act (FWA). [DE 102 at ¶¶30-38]. Because Plaintiff can prove through record evidence that he has established a *prima facie* case and that Defendants' proffered reason for their adverse employment actions is pretextual; summary judgment on Count I should be denied.

**A.    Plaintiff has established a *prima facie* case under the FWA.**

To establish a *prima facie* case under FWA, Mr. Tillman must prove that "(1) he objected to or refused to participate in an illegal activity, policy, or practice; (2) he suffered an adverse employment action; and (3) the adverse employment action was causally linked to his objection

---

[1] *U.S. v. Twenty (20) Cashier's Checks, Having the Aggregate Value of Two Hundred Thousand ($200,000) Dollars in U.S. Currency*, 897 F.2d 1567 (11th Cir. 1990); *see also Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992) (reversing summary judgment because different inferences could be drawn from the undisputed facts regarding the significance of the plaintiff's job responsibilities).

or refusal." *Hernandez v. Publix Super Markets, Inc.*, 11 F.Supp.3d 1177, 1182 (S.D. Fla. 2014) (citing *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So.3d 904, 916 (Fla. 4th DCA 2013)).

### 1. Plaintiff engaged in protected activity.

In satisfying the first element of his FWA claim, Mr. Tillman is only required to show that he had a good faith, objectively reasonable belief that his activity was protected by the statute. *Id.* at 1183 (citing *Aery*, 118 So.3d at 916).[2]

There are genuine issues of material fact regarding whether Defendants' actions were unlawful and whether Mr. Tillman had a reasonable belief that they were unlawful. Mr. Tillman knew that customers were told that paying an additional fee to purchase APS's SmartConnect product was "required" for customers to print using APS's QuickTicket software and a Zebra brand printer. ¶¶70-71,77. Defendants customers were told that APS's SmartConnect product was "embedded in the firmware" of the Zebra brand printers. Facts ¶73. Defendants now admit that these representations to customers are false. Facts ¶¶69-71. Defendants did not disclose to customers that purchasing SmartConnect was not actually needed for APS's software to function. As a current Trimble project manager admitted "it would be awkward, to say the least" because "[w]ould you buy something that somebody told you, well, you don't really need it but we're going to charge you?" Facts ¶81. Making false or deceptive statements or omitting material facts to induce customers to purchase a product is unlawful under a variety of laws.[3]

---

[2] *Odom v. Citigroup Glob. Markets Inc.*, 62 F. Supp. 3d 1330, 1336 (N.D. Fla. 2014) ("In claims brought under the Florida Whistleblower Act, Fla. Stat. § 448.102(3), an employee need only demonstrate that he had a "good faith, objectively reasonable belief" that the conduct that the employee objects to is illegal; the conduct does not need to actually violate the law."). Even under the minority approach that requires heightened proof of an actual violation of law, *Kearns v. Farmer Acquisition Co.*, 157 So.3d 458 (Fla. 2d DCA 2015), the record evidence cited herein creates a genuine issue of material fact regarding whether Defendants violated the laws cited in Footnote 3 *infra*.

[3] Under Florida's Deceptive and Unfair Trade Practices Act, "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. §501.204(1); *see also Hill v. Hoover Co.*, 899 F.Supp.2d 1259, 1265 (N.D. Fla. 2012) (defendant's alleged representations regarding its vacuum products that were false based on its previous experience could be an "unfair practice"); *Deere Construction, LLC v. Cemex Construction Materials Florida, LLC*, 15-cv-24375-CMA (S.D. Fla. 2016) (allegations of misleading descriptions of "fuel surcharge" made to customers that falsely implied that the defendants were not keeping the fees as profit stated a violation of FDUTPA). Iowa Code §714.16(2)(a) provides that: "The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or

Defendants' employees were told that it was required to add SmartConnect to sales of Zebra brand printers.  Facts ¶77. Mr. Tillman was told by several of his co-workers (including APS's Chief Technology Officer) that SmartConnect was "vaporware."  Facts ¶¶ 62-63, 72. During a Monday morning sales meeting, Lisa Swanson told the entire sales team, including the sales manager, that she believed SmartConnect was either vaporware or a fictitious product. Facts ¶83.[4]  Therefore, Mr. Tillman sent an email to his supervisor in July 2013 suggesting that APS stopped selling SmartConnect because "We are charging $$$$ for a line item that has no deliverables."  Facts ¶74.[5]

Mr. Tillman also objected to and refused to participate in Defendants' illegal activity or practice of charging customers for and recognizing revenue on products or services (in addition to SmartConnect) that were never delivered.  Facts ¶¶12, 17, 19.[6]  Mr. Tillman reasonably

---

misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise or the solicitation of contributions for charitable purposes, whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice." Iowa Code §714H.3 provides that: "A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes."

[4] Additionally, APS Sales Manager, Mike Denker, agreed with the statement that SmartConnect provided no deliverables to the customer.  Facts ¶80. The APS sales team "all knew you didn't have to sell Smart Connect to make the printer work."  Facts ¶80.

[5] In October 2013, Mr. Tillman followed up with Michael Denker regarding the status of his complaint on the SmartConnect product.  Mr. Denker assured Mr. Tillman that SmartConnect would not be sold in 2014 when the new software update was released.  Facts ¶17. Mr. Tillman later learned in January or February 2014, that SmartConnect was still being sold.  Facts ¶17.

[6] Sarbanes Oxley prohibits obtaining money "by means of false or fraudulent pretenses, representations, or promises" through mail or common carrier (18 U.S.C. § 1341), selling securities based upon "false or fraudulent pretenses, representations, or promises (18 U.S.C. § 1348).  Rules and regulations of the Securities and Exchange Commission prohibit improperly recognizing revenue. *See S.E.C. v. Monterosso*, 768 F. Supp. 2d 1244, 1248 (S.D. Fla. 2011), aff'd, 756 F.3d 1326 (11th Cir. 2014) (where improper revenue recognition violated SEC Rule 10-b5 found in 17 C.F.R. 240.10b-5 and the Court granted summary judgment against defendants); *S.E.C. v. Forman*, No. CIV. A. 07-11151-RWZ, 2010 WL 2367372, at *7 (D. Mass. June 9, 2010)  (where evidence of improper revenue recognition was sufficient to demonstrate a violation of SEC Rule 10-b5 found in 17 C.F.R. 240.10b-5 and withstand summary judgment).

believed that this conduct was unlawful since it violated Trimble's revenue recognition policy to collect and recognize revenue (but never give the customer what it purchased). Facts ¶96.

Mr. Tillman once again blew the whistle on Defendants' unlawful practices in in writing May 2014. After meeting with Trimble's Internal Audit Department, Mr. Tillman emailed Mark Adams and Mark McIntire on May 19, 2014, bringing up several issues "for proper consideration and resolution." Facts ¶103. Mr. Tillman's May 19, 2014 e-mail blows the whistle on (1) the fact SmartConnect was being sold based on false and misleading statements; (2) that the APS sales team was required to sell products that were not recorded in Defendants' SalesForce recording software; and (3) APS sales team was instructed to sell a photo enforcement product that was not approved for lawful use in several jurisdictions. Facts ¶103. Mr. Tillman continued to refuse to participate in Defendants' illegal practice of selling products based on fraudulent or misleading information until he was ultimately terminated. Facts ¶8.

### 2. Mr. Tillman suffered adverse employment actions, including, but **not** limited to, the eventual termination of his employment.

"Adverse employment action does not refer only to ultimate employment decisions, such as the decision to discharge an employee." *See Shannon v. Bell South Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)). Mr. Tillman was subjected to multiple adverse employment actions after he engaged in protected activity.[7]

In May or June 2014, Mr. Tillman's supervisor instructed Mr. Tillman's co-workers to not discuss company business with Mr. Tillman because of issues Mr. Tillman raised that led to this litigation. Facts ¶105. This instruction by Defendants' management effectively cut Mr. Tillman off from Defendants' operations and created an environment of ostracism. Mr. Tillman's ostracism by co-workers due to an instruction by a supervisor is an adverse employment action.[8]

---

[7]  "[C]onduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute adverse action under Title VII." *Id.* (quoting *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001)).

[8]  *Braswell v. Washington Cty.*, No. 5:14-CV-05387, 2016 WL 1178795, at *7 (W.D. Ark. Mar. 23, 2016)(finding that a reasonable jury could conclude that plaintiff suffered an adverse employment action by looking to the "cumulative effect" of employer's conduct, which included "acts of disrespect and ostracism"); *Mahony v. KeySpan Corp.*, No. 04 CV 554 SJ, 2007 WL 805813, at *6 (E.D.N.Y. Mar. 12, 2007) (analyzing temporal proximity and concluding that a reasonable jury could find that the "string of retaliatory acts culminating in plaintiff's termination" was a contributing factor in the adverse employment action, where plaintiff alleged he was "being isolated within the company"); *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d

5

In January 2014, Mr. Tillman's supervisor refused to approve of a sale of printers that he made for APS customer. Facts ¶108. However, Mr. Tillman's supervisor later approved of the sale (on the same terms that Mr. Tillman had already negotiated) so that Amy Oakley received the commission of approximately $8,000.00. Facts ¶108.

On April 2, 2014, Bill Martin demanded that Mr. Tillman sign a Compensation Plan for 2014 that changed the compensation policy so Mr. Tillman would not receive compensation on multi-year contracts. Facts ¶39. Importantly, Defendants' corporate representative admitted that this change was made to the compensation plans for all employees in Mr. Tillman's position, but only negatively impacted Mr. Tillman's compensation. Facts ¶39. *McCulley v. Allstates Technical Serv.*, 2005 WL 1475314, *5 (S.D. Ala. 2005) (not paying commissions qualifies as an adverse employment action).

In sum, before his termination (which Defendants concede is an adverse employment action), a supervisor instructed co-workers to not talk to Mr. Tillman, a supervisor refused to approve of a sale for Mr. Tillman but later approving of the same sale for another employee, and Trimble changed a compensation policy that only negatively impacted Mr. Tillman. When this chain of post-protected activity actions are "considered collectively," as the law requires, they rise to the level of an adverse employment action. *Shannon*, 292 F.3d at 716 (quoting *Bass*, 256 F.3d at 1118); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).[9]

### 3. The adverse employment actions are not wholly unrelated to Mr. Tillman's protected activity.

To establish causation for purposes of a prima facie case under the FWA, Mr. Tillman merely has to prove that the protected activity and the negative employment action are "not wholly unrelated." *Rustowicz v. North Borward Hosp. Dist*, 174 So.3d 414, 426 (Fla. 4th DCA 2015). Courts should "interpret 'the causal link broadly.'" *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1571-72 (11th Cir.1993)). "[T]he causation element for retaliatory discharge [under the

---

254, 262 (5th Cir. 2014) ("[T]he employer's targeted disclosure to the whistleblower's colleagues that the whistleblower had reported them to the authorities for alleged wrongdoing and has caused them to become the subject of an official investigation, thus creating an environment of ostracism, well might dissuade a reasonable employee from whistleblowing.").

[9]   *See also McCulley*, 2005 WL 1475314 at *6 ("Courts have routinely held that a causal connection exists even as to retaliatory acts occurring long after the protected activity, where those events are temporally linked by a chain of intervening retaliatory acts).

FWA] can be satisfied by sufficient evidence that the decision-maker of the employer was actually aware of the protected conduct, and that there was a close temporal proximity between *the decision maker's awareness* of the protected activity and the adverse employment action. *Rustowicz*, 174 So. 3d at 426.

There are genuine issues of material fact regarding whether the adverse employment actions suffered by Mr. Tillman (including his termination) were "not wholly unrelated" to his protected activity. The testimony of Defendants' Rule 30(b)(6) designee creates a fact issue as to whether the corrective action plan and ultimate termination were caused Mr. Tillman's objections to activity that he reasonably believed violated the law.  Facts ¶8.[10]  Given the fact issues regarding the legality of Defendants' conduct, Defendants cannot rely on the fact that Mr. Tillman continually refused to participate in that conduct against the demands made of Mr. Tillman in the Final Written Warning and corrective action plan documentation. *McCulley*, 2005 WL 1475314 at *21 ("an employee's rejection of [unlawful] activities is plainly a means of opposing such unlawful conduct"). Mr. Tillman engaged in ongoing and continuous protected activity by refusing to participate in Defendants' practice of selling products based upon false and misleading representations or omissions. *Sharpe v. Glob. Sec. Int'l*, 766 F. Supp. 2d 1272, 1301 (S.D. Ala. 2011) (denying defendant's motion for summary judgment finding that plaintiff's "continued complaints where themselves protected activities."); *Younger v. Ingersoll-Rand Co.,* 2013 WL 6241591, *10 (S.D. Ohio 2013) (rejecting defendant's temporal proximity argument when plaintiff employee engaged in ongoing protected activity); *Davison v. City of*

---

[10] W. Martin Dep. at 206:24-207:17 ("Q. And didn't Mr. Tillman explain to Trimble and APS that he was struggling to comply with the corrective action plan because of his concerns that it was asking him to perform sales that he believed were illegal or unethical? … THE WITNESS:· In part, yes.  BY MR. FEICHT: Q. And as a result of that, didn't Mr. Tillman's refusal that he described was making it difficult to comply with the corrective action plan lead to a decline in his performance that was the reason for his ultimate termination in September of 2014? ... THE WITNESS: It was a part of it, yes."); W. Martin Dep. at 217:2-13 ("Q.  Does this E-Mail state that Peter Tillman told  Hal Marshall that he quote, "...isn't comfortable  representing APS products (based on his allegations of  'vaporware') and so has been advised by his legal counsel to limit his exposure at this point."  A.   That's what it states.  Q.  If that statement is true, wouldn't that  result in a decline in Peter Tillman's performance from June 6th to September when he was ultimately terminated? THE WITNESS:  For a subset of our products, yes.). Additionally, Hal Marshall, Human Resources Manager for Trimble, told Amy Oakley, possibly before Mr. Tillman was officially terminated, that he wished Peter Tillman would just "drop" his complaints about SmartConnect.  Facts ¶78.

*Minneapolis, Minn*, 490 F.3d 648, 657 (8th Cir. 2007) ("the fact that the three denied promotions occurred while [plaintiff]'s protected activities were ongoing and continuous cannot be characterized as coincidental on this record.").[11]

Defendants' arguments regarding a "fourteen-month delay" between his first protected activity and the ultimate termination [DE 136 at p. 7] ignore the facts that Mr. Tillman engaged in other protected activity <u>after</u> he first complained in writing in July 2013 (*see* pp. 3-5 *supra.*) and that he suffered other adverse employment actions <u>before</u> his termination in September 2014 (*see* pp. 5-6 *supra.*). "[A] plaintiff will present an issue of material fact regarding causality where she engages in protected activity and then continues to lodge complaints up until the time of the

---

[11]  For the same reasons, Mr. Tillman was not engaged in "intervening misconduct" that breaks the causal chain.  Mr. Tillman was objecting to and refusing to participate in Defendants' unlawful practices.  Defendants rely upon two unreported cases to argue that Mr. Tillman's refusal to participate in Defendants' unlawful practices was "intervening misconduct."  *See Hankins v. Airtran Airways, Inc.*, 237 Fed.Appx. 513 (11th Cir. 2007); *Henderson v. FedEx Express*, 442 Fed.Appx. 502 (11th Cir. 2011). Both of those cases are factually distinguishable because the plaintiffs in those cases engaged in misconduct (threatening to harm a supervisor and falsifying time card) that was *unrelated* to the plaintiff's protected activity. Moreover, legally ignoring record evidence of temporal proximity because of purported misconduct improperly increases a plaintiff's *prima facie* burden.  *See Gross-Jones v. Mercy Medical*, 874 F.Supp.2d 1319, 1343-45 (S.D. Ala. 2012), *on reconsideration in part,* 2012 WL 2416651 (S.D. Ala. June 26, 2012) (rejecting the *Hankins-Henderson* approach as going "well beyond the purpose of a prima facie case). Similarly, Defendants cannot characterize Mr. Tillman's ongoing protected activity as "insubordination" where the record evidence shows that Defendants knew as early as April 2014 that Mr. Tillman was refusing to participate in the unlawful activity, Facts ¶22, and had reasonably offered to be placed on administrative leave, Facts ¶27, but Defendants decided to play "the waiting game per the attorneys" Facts ¶26. There is at least a genuine issue of material fact whether Mr. Tillman's actions were reasonable given his knowledge of conduct that was unlawful or that he reasonably believed was unlawful.  Trimble employees are required to avoid situations where questionable business conduct may arise and if they witness questionable business conduct alerting the general manager would be an appropriate action. Facts ¶97. It would violate Trimble's Business Ethics and Conduct Policy for a Trimble employee to try to sell a product or service to a customer that the employee has information indicating that the product or service does not comply with all applicable laws and regulations. Facts ¶98. According to Trimble's 30(b)(6) designee regarding its Business Ethics and Conduct Policy, it would be a reasonable action of an employee to stop selling a product if the employee feels a product is not complying with laws or is misleading. Facts ¶98. Defendants' reliance on *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397 (11th Cir. 1989), is misplaced as that decision was rendered after a non-jury trial, not at the summary judgment stage.

adverse employment action." *Grier v. Snow*, No. CIV. 1:04CV397-JTC, 2006 WL 5440387, at *20 (N.D. Ga. Mar. 15, 2006).[12]

On April 2, 2014, Mr. Tillman was provided a "Final Written Warning," ***less than one week*** after Mr. Tillman complained that he was "owed commission and under Iowa law I have a right to collect these commissions"; shared his feeling that he was "being discriminated against because of [his] age'"; and identified "accounting irregularities in reporting sales that have affected my commissions …[and] lost revenues for sales that affect not only the company but also its shareholders." Facts ¶29, 31 (not just Martin Dep. re warning- need cite to written Complaint 3/27/14). This Final Written Warning was provided in contravention of Defendants' progressive discipline policy, Facts ¶31, and was cited in Defendants' termination notice provided to Mr. Tillman. Facts ¶31.

In an attempt to avoid the inference of causation, Defendants' Motion mistakenly argues that Defendants were contemplating disciplining Plaintiff <u>before</u> he ever blew the whistle. [DE 136 at pp. 7-8.][13] This argument ignores the fact that Mr. Tillman first objected in writing to Defendants' practice of selling SmartConnect as a separate product as early as July 2013. Facts ¶15.[14] Mr. Tillman re-raised his objections again May 2014 and continued to refuse to

---

[12] *See also Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (reversing lower court's granting of summary judgment, noting that plaintiff's initial complaint when "viewed in isolation" would not establish temporal proximity, but holding that plaintiff established temporal proximity because plaintiff "repeatedly engaged in protected activity," including subsequent inquiries into the investigation); *Cobb v. Syniverse Tech., Inc.,* 359 F.Supp.2d 1287, 1290 (M.D.Fla.2005) (denying defendant's motion for summary judgment and finding that plaintiff established a causal connection for purposes of summary judgment, where plaintiff continued to make complaints).

[13] Defendants' Motion asserts that there is a fourteen (14) month delay between his initial protected activity in July 2013 and his ultimate termination in September 2014, but then later admits that Plaintiff engaged in protected activity by raising issues in writing again in March 2014 (but argues it is irrelevant because they were already planning on disciplining him anyway). These incongruent positions ignore the facts that (1) Plaintiff was assured in October 2013 that SmartConnect would no longer be sold, Facts ¶76, and (2) that Plaintiff continually engaged in protected conduct throughout the spring and summer of 2014. *See* pp. 3-5 *supra*.

[14] Moreover, Defendants only claim to have been contemplating giving Mr. Tillman a corrective action notice in March 2014 and there is no record evidence they were already contemplated *terminating* Mr. Tillman's employment in March 2014 and Defendants do not advance such an argument. *See Jones v. Water Works Bd. of the City of Birmingham*, 2012 WL 2856651, *13 (N.D. Ala. 2012) (rejecting argument that adverse action was contemplated before protected

participate after he learned that Defendants were persisted in their sales of SmartConnect despite his supervisor's promises to the contrary. Facts ¶¶8, 103. Mr. Tillman still has an extremely strong temporal proximity argument as he was ultimately terminated on September 16, 2014, just <u>one day</u> after forwarding complaints of a customer who never received software services that they paid for. Facts. ¶31.[15]

### B. Plaintiff has established that Defendants' proffered reason is pretextual.

"In analyzing Plaintiff's claim under the Florida Whistleblower Act, the court applies the burden-shifting framework used for Title VII retaliation cases." *Salazar v. Delta Health Group, Inc.*, 2010 WL 5313497, *13 (S.D. Fla. 2010) (citing *Sierminkski v. Transouth Financial Corp.*, 216 F.3d 945, 950 (11th Cir. 2000)). Thus, if Defendants provide a legitimate business reason for the adverse employment actions that is unrelated to Mr. Tillman's protected activity, the burden will shift to Mr. Tillman to show pretext. *See id.*[16]

---

activity where only discipline was contemplated and there was no evidence that discharge was contemplated before plaintiff's protected activity).

[15] A jury could reasonably believe that Mr. Tillman's written complaint to Scott Mellett on September 15, 2014 that Defendants' customers had not received services they had paid for stoked Mellett's animus for Mr. Tillman's objection to Defendants' practice of recognizing revenue on products or services that were not delivered. EEOC Enforcement Guidance on Retaliation and Related Issues 915.004, August 25, 2016 ("actions related to the continued processing of a complaint may remind an employer of its pendency or stoke an employer's animus").

[16] Defendants have attempted to shift the burden back to Mr. Tillman by proffering a legitimate business reason for Mr. Tillman's termination. However, the testimony of William Martin and Scott Mellett (*see* n. 10 *supra.*) establish that Defendants' proffered reason of poor performance is ***related to*** Mr. Tillman's engaging in protected activity by refusing to sell Defendants' products and objecting to the sale of SmartConnect. By admitting that the adverse employment actions were related to Mr. Tillman's protected activity, there are genuine issues of material fact regarding Defendants' proffered legitimate business reason. Therefore, the inference of retaliation created by Mr. Tillman's prima facie case remains intact and summary judgment is inappropriate. *Salazar*, 2010 WL 5313497 at *13 ("If a reason ***unrelated*** to participation [in protected activity] is offered, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext.") (emphasis added). Alternatively, the Court can rule that this testimony is direct evidence of pretext as Mr. Tillman's protected activity more likely motivated Defendants. *See Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997) (a plaintiff can prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence*.") (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (emphasis in original).

Even if Defendants' proffered reason of poor performance was *unrelated to* Mr. Tillman's objections or refusal to participate in Defendants' unlawful activity, Mr. Tillman can establish that this reason is pretextual by showing it is unworthy of credence in eight (8) independent ways. *Albert-Aluya v. Burlington Coat Factory Warehouse Corp.*, 470 F. App'x 847, 851 (11th Cir. 2012) (district court erred in granting the defendants' summary judgment motion where plaintiff presented sufficient evidence such that a reasonable factfinder could find that defendant's proffered nondiscriminatory reason "unworthy of credence").

First, Defendants have provided contradictory testimony and documentation as to *who* ultimately decided to terminated Mr. Tillman's employment. Defendants Rule 30(b)(6) designee regarding the decision to terminate Mr. Tillman testified that "The decision to terminate was Scott Mellet." Facts ¶31. Mr. Mellett testified under oath during his deposition on November 4, 2016 regarding Mr. Tillman's termination: "It was <u>not</u> my decision." Facts ¶26. In August 2014, Hal Marshall informed APS General Manager, Bill Martin, that Mr. Tillman could now be terminated with Mr. Martin's approval. Facts ¶26. However, an email sent on the day Mr. Tillman was terminated (September 16, 2014) by Trimble's Manager of Human Resources, Hal Marshall, with the subject line "Tillman" states that Mr. Marshall "Got the ok to term from Jim K Working on it now…." Facts ¶109.[17] Defendants, through William Martin (who served as Defendants' 30(b)(6) designee regarding Mr. Tillman's termination), ***do not know*** who actually concluded that Mr. Tillman did not meet the performance objectives set by the corrective action or subsequent status reports even though that conclusion purportedly led to his termination. W. Martin Dep. at 237:8-17. This inconsistency regarding whether Scott Mellett, Bill Martin, or Jim Kirkland made the ultimate decision to terminate proves pretext. *Turco v. Fid. Info. Services, Inc.*, 2006 WL 2567913, at *5-6 (M.D. Fla. Sept. 5, 2006) (denying the defendant's motion for summary judgment and finding there were sufficient inconsistencies in the defendant's account of the plaintiff's termination, including "who terminated" the plaintiff).

Second, Mr. Mellett has now changed his story and submitted a sham affidavit in support of Defendants' Motion for Summary Judgment that contradicts his previous sworn testimony. Mr. Mellet testified during his deposition in November 2016 that "It was <u>not</u> my decision." In his affidavit dated March 30, 2017, Mr. Mellet claims that: "I made the decision to terminate

---

[17]   "Jim K." is undoubtedly a reference to James "Jim" Kirkland, Trimble's in-house counsel who was consulted regarding "the process" of Mr. Tillman's termination. Facts ¶109.

Plaintiff due to his poor job performance." [DE 137-10 at ¶9.] Summary judgment is improper because of this inconsistent testimony regarding the key fact of whether Mr. Mellett actually made the decision to terminate Plaintiff. *F.D.I.C. v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 2013 WL 1092228, *6, n. 7 (M.D. Fla. 2013) ("[A] party's prospects of winning on summary judgment are greatly diminished when that party provides internally inconsistent testimony regarding key facts."). A fact-finder should be permitted to review Mr. Mellett's change in testimony, weigh the credibility of the purported decision-maker, and consider whether it makes Defendants' proffered reason unworthy of credence.[18]

Third, there is record evidence that the decision to terminate Mr. Tillman was made as early as March or April of 2014 but was intentionally delayed until September. Scott Mellett (who initially denied making the decision but has now proffered an affidavit contradicting his testimony) claimed that he made the "recommendation" to terminate Mr. Tillman's employment in March or April of 2014. Facts ¶26. However, the purported decision-maker could not provide any explanation why Mr. Tillman was not terminated until September 2014 when he believed reasons existed to do so over six (6) months earlier. Facts ¶26. Additionally, Trimble employee, Mark Adams, sent an email on April 29, 2014 asking for the contact information for "the HR person who is working the Peter Tillman separation." Facts ¶26. This evidence allows the reasonable inference to be made that the termination decision was made as early as March or April 2014.

In May 2014, Trimble's former Manager of Human Resources, Hal Marshall, told Scott Mellett and Bill Martin that "We should sit & discuss a strategy specifically for this territory **while we play the waiting game per the attorneys**." Facts ¶26 (emphasis added). A reasonable factfinder could find this email as circumstantial evidence that Defendants intentionally delayed the decision to officially terminate Mr. Tillman, possibly to build a defense by decreasing the temporal proximity between Mr. Tillman's initial complaints about Defendants' unlawful behavior and the termination. The record evidence of the purported decision-makers "play[ing] the waiting game" should be presented to a jury who may choose to disbelieve Defendants'

---

[18] The Court may also disregard Mr. Mellet's affidavit since it contradicted prior testimony. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) (A court may disregard an affidavit in support of a summary judgment position "when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction.").

proffered reason of poor performance. *Laxton v. Gap Inc.*, 333 F.3d 572, 582 (5th Cir. 2003) (finding jury could have reasonably calculated that employer's proffered reason for discharge was pretextual, where plaintiff presented evidence that her supervisors made an effort to "compile a laundry list of violations to justify a predetermined decision to terminate" plaintiff).[19]

This inexplicable delay in the termination proceedings from February, March, April, May, and August 2014 to the ultimate decision in September 2014, especially when combined with the evidence that Defendants were "play[ing] the waiting game per the attorneys," is prototypical evidence of pretext. *Severe v. O'Reilly Automotive Stores, Inc.*, 92 F.Supp.2d 892, 903 (N.D. Iowa 2015) ("[A]ny evidence allowing an inference that the termination decision was actually made prior to [date proffered by the defendant employer], would contradict [the defendant employer]'s position and cast doubt on its explanation."); *Larios v. McLane Co., Inc.*, (D. Or. 2008) ("[D]fendants' delay in commencing the termination proceedings shows pretext…. The timing, along with defendants' specious explanation of plaintiff's termination, indicate that defendants may have acted with a retaliatory motive.").

Fourth, there is record evidence that the decision to terminate Mr. Tillman did not follow Defendants' normal procedures. William Martin testified that the documentation showing that his approval was required by Trimble's Human Resources Department to terminate Mr. Tillman shows that the final decision was made through a "non-standard process" that was unlike any of the other approximately twenty (20) terminations he was involved with as an employee of Trimble. Facts ¶31. This evidence (from Defendants' 30(b)(6) designee) that Defendants deviated from their standard process in terminating Mr. Tillman's employment establishes

---

[19]   *See also Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 476–77 (5th Cir. 2015) (reversing lower court's grant of summary judgment and finding plaintiff's evidence bore directly on pretext, where plaintiff contended that the employer "manufactured steps" in its progressive disciplinary policy by issuing written warnings to "paper [plaintiff's] file after it had decided to fire him.") ; *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 236–37 (5th Cir. 2015) (reversing lower court's grant of summary judgment and finding plaintiff produced substantial evidence of pretext, where plaintiff presented evidence of defendants' sudden and unprecedented campaign "to create an exculpatory paper trail" documenting plaintiff's deficiencies to justify decision to terminate plaintiff which had already been made). Additionally, while Hal Marshall informed Bill Martin that Mr. Tillman could now be terminated with Martin's approval in August 2014, Mr. Martin could not explain why Mr. Tillman was not terminated until over a month later on September 16, 2014. Facts ¶26. Hal Marshall told Amy Oakley, possibly before Mr. Tillman was officially terminated, that he wished Peter Tillman would just drop his complaints about SmartConnect. Facts ¶78.

pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (reversing lower court's grant of summary judgment for employer where plaintiff presented sufficient evidence of pretext precluding summary judgment by showing "employer's deviation from its own standard procedures"); *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1084 (8th Cir. 2013) (quoting *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 726 (8th Cir. 2001) ("The employee may demonstrate pretext by showing that 'it was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case.'")).

Fifth, the record evidence shows that Defendants did not apply their standard disciplinary policies to Mr. Tillman. Trimble's progressive discipline policy provides that a verbal warning or a written warning would be provided before a final written warning. Facts ¶31. This procedure was not followed as Mr. Tillman was first given a final written warning. Facts ¶31. "[W]hen an employer has established a progressive discipline policy, a plaintiff may establish pretext by showing that the policy was not followed in his case." *Ritchie v. Indus. Steel, Inc.*, 426 Fed. Appx. 867, 873 (11th Cir. 2011).

Sixth, Defendants hid the results of the Trimble's Internal Audit Investigation into Mr. Tillman's allegations of unlawful activity. After analyzing just the five (5) customers Mr. Tillman specifically identified, Trimble's Internal Audit department concluded that approximately $180,000.00 of revenue was prematurely recognized just as Mr. Tillman complained. Facts ¶31. Instead of thanking Mr. Tillman for identifying this improper revenue recognition, Defendants told Mr. Tillman that it had investigated Mr. Tillman's allegations and determined they were without merit. Facts ¶31. Given the inconsistency between the Internal Audit Investigation's findings and the misleading conclusion communicated to Mr. Tillman in August 2014, a reasonable fact-finder could conclude that the reason given to Mr. Tillman for his subsequent termination on September 16, 2014 was pretextual.

Seventh, Defendants have provided different reasons for terminating Mr. Tillman's employment in this litigation from what was told to Mr. Tillman when he was officially terminated. The termination letter provided to Mr. Tillman identifies one reason for his termination: failure to meet "performance objectives." Facts ¶31. However, Defendants' Answers to Interrogatories list fifteen (15) different reasons for Mr. Tillman's termination. Facts ¶31. While many of the reasons provided by APS's interrogatory answer are arguably related to Mr. Tillman's job performance, it adds "Plaintiff's insubordination" which was never

communicated to Mr. Tillman. Facts ¶31. Moreover, during this litigation Trimble provided sworn answers to interrogatories that deny Mr. Tillman was <u>ever</u> employed by Trimble. Facts ¶110. Defendants' Motion now concedes that Mr. Tillman "accepted APS/Trimble's offer of employment and was reclassified as a full-time W-2 employee by Trimble." [DE 136 at p. 1.] These shifting explanations serve as evidence of pretext. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1195 (11th Cir. 2004) (reversing lower court's grant of renewed judgment as a matter of law, where the court found the jury's verdict had a sufficient evidentiary basis because the employer's "shifting reasons" for terminating employee allowed the jury to find the employer's explanation unworthy of credence).[20]

Eighth, in 2016 (after Mr. Tillman initiated this lawsuit challenging the legality of SmartConnect), Trimble employees were instructed to stop selling SmartConnect by Scott Mellett. Facts ¶79. After that announcement APS Controller, Carolyn Stelmat, would then reject proposed deals that still included SmartConnect. Facts ¶79.

Because Defendants have: (1) provided contradictory evidence regarding who made the termination decision, (2) submitted an affidavit by the purported decision-maker contradicting previous sworn testimony, (3) exchanged internal communications proving the decision was intentionally delayed 6 months while Defendants "play[ed] the waiting game"; (4) did not follow their normal decision-making procedures; (5) did not follow their disciplinary policies; (6) lied to Mr. Tillman regarding the investigation confirming his allegations of improper revenue recognition; (7) added a new reason for terminating plaintiff while initially denying he was employed by Trimble during this litigation; and (8) have implicitly recognized that SmartConnect does not provide deliverables to customers by instructing their employees to stop selling the product in 2016; Plaintiff has met his burden of proving pretext and summary judgment must be denied as to Count I.

---

[20] *See also Barkhoff v. Bossard North America, Inc.*, 684 F.Supp.2d 1096, 1113 (N.D. Iowa 2010) (quoting *Roberts v. Park Nicollet Health Services*, 528 F.3d 1123, 1128-29 (8th Cir. 2008)) ("A factfinder may deem the conflicting evidence probative on the question whether the employer's asserted reasons for the termination were true." ); *McCulley*, 2005 WL 1475314 at *12 (quoting *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 285 (3rd Cir. 2001)) ("[i]f a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext").

**II.      There are genuine issues of material fact regarding whether Mr. Tillman was retaliated against in violation of SOX's anti-retaliation provisions.**

### A.  Mr. Tillman has made a *prima facie* showing of a SOX whistleblower claim.

To establish a *prima facie* case of retaliation in violation of 18 U.S.C. § 1514A, Mr. Tillman must establish "(1) that he engaged in protected activity; (2) the employer knew or suspected, either actually or constructively, that he engaged in the protected activity; (3) he suffered an unfavorable personnel or employment action; and (4) the protected activity was a contributing factor in the unfavorable action." *Rhinehimer v. U.S. Bancorp Investments, Inc.*, 787 F.3d 797, 805 (6th Cir. 2015); 29 C.F.R. § 1980.104(d)(2).

Mr. Tillman engaged in protected activity when he complained about Defendants recognizing revenue prematurely and recognizing revenue on products or services that were never delivered to paying customers. Facts ¶103.  Mr. Tillman had a reasonable belief that Defendants' practice of recognizing revenue prematurely and recognizing revenue on products or services that were never delivered to paying customers violated SOX.  Facts ¶86; *Rhinehimer*, 787 F.3d at 812 (6th Cir. 2015) ("[C]ourts universally recognize that § 1514A protects employees who reasonably but mistakenly believe that the conduct at issue constitutes a violation of relevant law."). "The inquiry into whether an employee had a reasonable belief is necessarily fact-dependent, varying with the circumstances of the case." *Rhinehimer*, 787 F.3d at 811.  "For this reason, '[t]he issue of objective reasonably should be decided as a matter of law **only when no reasonable person** could have believed that the facts [known to the employee] amounted to a violation' or otherwise justified the employee's belief that illegal conduct was occurring."[21]  "[A] plaintiff is not required to show an actual violation of the law, but only that she 'reasonably believed' that there was a violation of one of the enumerated laws or regulations. *Collins v. Beazer Homes USA, Inc.*, 334 F.Supp.2d 1365, 1376 (N.D. Ga. 2004) (quoting 18 U.S.C. § 1514A).[22]

---

[21] *Id.* (emphasis added) (quoting *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 361 (4th Cir. 2008) (Michael, J., dissenting) *quoted in Sylvester v. Parexel Int'l LLC*, ARB Case No. 07-123, 2011 WL 2165854, *12 (ARB 2011)).

[22] Importantly, while he was employed and objecting to these practices, Defendants did <u>not</u> provide Mr. Tillman access to the information that they now attempt to use against him to prove that these financial issues were not "material."  Defendants did not disclose the total revenue collected on SmartConnect until providing answers to interrogatories on  March 22, 2017. Facts

Defendants recognized $958,674.07 in revenue from the sale of SmartConnect and its associated project management and annual maintenance fees. Facts ¶85. This revenue was recognized on sales that were made based upon false and misleading representations and intentional omissions regarding the SmartConnect product. Facts ¶¶69-73. Mr. Tillman reasonably believed that recognizing revenue on a product under circumstances where the customer was misled by false and deceptive representations and omissions and where the customer received no additional product or services would violate applicable law, including 18 U.S.C. § 1341 (Fraud and swindles) or 18 U.S.C. § 1348 (Securities and commodities fraud).[23]

APS's former Vice President of Sales, Michael Sparks, testified that APS would still recognize the revenue on products that were not fully delivered. Facts ¶56.  Moreover, Mr. Tillman determined from reviewing internal records that revenue had been recognized on specific products that he had personal knowledge had not been delivered.  Facts ¶56. Mr. Tillman learned that customers were asked to "accept" products so Defendants could recognize the revenue despite the fact there were outstanding promises of future deliverables.  Facts ¶56.  This practice by Defendants was confirmed by former Project Manager, Craig Bilawsky and current Trimble Project Manager, Richard Sudasassi.  Facts ¶56.

As admitted by Defendants' 30(b)(6) designee, recognizing revenue on software products that were not completely delivered could violate Trimble's revenue recognition policy.  Facts ¶94. Thus, Mr. Tillman reasonably believed that recognizing revenue on products or services that were never delivered as promised would violate applicable law, including 18 U.S.C. § 1341 (Fraud and swindles) or 18 U.S.C. §1348 (Securities and commodities fraud).[24]

---

¶85.  Defendants did not disclose Trimble's gross revenue information until the Affidavit of Lori Ciccone was filed in support of their Motion. [DE 137-9.]  Accordingly, this information cannot be considered in analyzing the reasonableness of Mr. Tillman's good faith beliefs back in 2014.

[23] Invoices that included false statements that SmartConnect was required to operate with APS software was included in invoices sent through U.S. Mail.  Facts ¶77. Thus, Mr. Tillman's complaints implicated 18 U.S.C. § 1341 (prohibiting obtaining money "by means of false or fraudulent pretenses, representations, or promises" through mail or common carrier). Defendants' practice was to ship RFP (Request for Proposal) responses via Federal Express, UPS, or U.S. Mail. Facts ¶112.

[24] Mr. Tillman's communications related to these laws as he specifically objected to the impact of deceptive sales on the accuracy of Trimble's financial statements, which implicates 18 U.S.C. § 1348 (prohibiting sales of securities based upon "false or fraudulent pretenses, representations, or promises).  *See* Footnote 6 *supra.*

Mr. Tillman also objected and refused to participate in sales of two products (StarChase and Velocity Snap) because the entire sales team was instructed not to record those sales in Defendants' internal recording software, SalesForce. Facts ¶101. Mr. Tillman reasonably believed that making sales without recording those sales so that they could be properly accounted for in Defendants' financial statements circumvented Defendants' policies and practices designed to ensure accurate financial reporting. Facts ¶101. Accordingly, Mr. Tillman had a reasonable belief that these sales circumvented Defendants' internal controls, which would be a violation of SEC rules or regulations or federal law relating to fraud against shareholders. *See e.g.*, 15 U.S.C. 78m(b)(3)(B)(5) (prohibiting any person from "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" of registered securities).[25]

Defendants knew that Mr. Tillman engaged in the protected activity. After Mr. Tillman blew the whistle on these unlawful activities in writing to his supervisors, he met with Trimble's Internal Audit department. Facts ¶103. Scott Mellett (the purported decision-maker) and Bill Martin (APS General Manager) had direct knowledge that Mr. Tillman met with Trimble's Internal Audit department. Facts ¶9, 25.[26]

As described above, pp. 5-6 *supra*, Mr. Tillman suffered multiple unfavorable employment actions, including his eventual termination, after he engaged in protected activity. *Allen v. Administrative Review Bd.*, 514 F.3d 468, 476, n.2 (5th Cir. 2008) (SOX whistleblower plaintiff must prove "'Unfavorable personnel action").

There are genuine issues of material fact regarding whether Mr. Tillman's protected activity was a contributing factor in the unfavorable action. *See* pp. 6-10 *supra*. One of the two auditors leading the Internal Audit Investigation into Mr. Tillman's allegations of improper

---

[25] Even the legal authority cited by Defendants recognizes that "[t]he employee is not required to provide the employer with the citation to the precise code provision in question. The employee is not required to show that there was an actual violation of the provision involved." *Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir. 2009). Summary judgment is inappropriate because a reasonable person could believe the conduct described above violated SOX. *Burns v. Medtronic, Inc.*, 2016 WL 3769369 (M.D. Fla. 2016)("If there is any question about whether the reasonable minds could disagree about whether belief was objectively reasonable, the issue cannot be decided as a matter of law.").

[26] Moreover, Defendants concede that "In July 2013 and between March and May 2014, Plaintiff complained about SmartConnect being non-existent. Between March and May 2014, he also complained about improper revenue recognition." [DE 136 at p. 15.]

revenue recognition contacted William Martin on April 29, 2014 (approximately one month after Mr. Tillman raised his allegations regarding "accounting irregularities") and asked for "the HR person who is working the Peter Tillman separation." Facts ¶26. That record evidence alone establishes close temporal proximity that creates a fact issue regarding whether Mr. Tillman's protected activity was a contributing factor in his eventual separation in September after Defendants "play[ed] the waiting game per the attorneys." Facts ¶26. Moreover, Defendants deceived Mr. Tillman and intentionally did <u>not</u> disclose to him that the Internal Audit Report had concluded that Mr. Tillman was correct and that $180,000.00 of revenue was prematurely recognized. Facts ¶31.

**B. Defendants have not met their burden of proving by clear and convincing evidence that they would have taken the same adverse action in the absence of Mr. Tillman's protected activity.**

Summary judgment is inappropriate because Defendants have not established by "clear and convincing evidence" that they would have taken the same unfavorable personnel actions in the absence of the protective behavior. Viewing the record evidence as a whole, a reasonable fact-finder could conclude that Defendants would not have taken the same adverse personnel action against Mr. Tillman in the absence of his protected activity. *See* pp. 6-10 *supra* (describing causal connection between Mr. Tillman raising allegations against Defendants and subsequent adverse actions).

Critically, the person investigating Mr. Tillman's allegations references that the "separation" of Mr. Tillman's employment was a foregone conclusion before Mr. Tillman was interviewed by the Internal Audit department and before their investigation was completed. Facts ¶26. The facts that Defendants (1) were discussing "separati[ng]" Mr. Tillman before they learned that he had correctly identified $180,000.00 in prematurely recognized revenue and (2) rather than thanking Mr. Tillman for bringing the $180,000.00 in prematurely recognized revenue to their attention, Defendants did not communicate the results of that Internal Audit Investigation to Mr. Tillman, could lead to the reasonable inference that the unfavorable personnel actions were causally connected.

Defendants do not address the adverse actions *other than* Mr. Tillman's ultimate separation. [DE 136 at p. 16.] Moreover, Defendants' "non-retaliatory rationale for Plaintiff's termination" is his job performance, including his purported failure to attend weekly sales

meetings in March through September 2014.  *Id.* However, Mr. Tillman asked his supervisor, Scott Mellett on March 24, 2014: "Do you want me on the call today?" Facts. ¶102.  Mr. Mellett never responded, so Mr. Tillman followed up with Hal Marshall, Trimble's HR Manager, who confirmed Mr. Tillman should not attend the week meeting.  Facts ¶102. Accordingly, there is a genuine issue of material fact whether Mr. Tillman's actions of not attending subsequent sales meetings was reasonable and whether Mr. Tillman was meeting the reasonable expectations of his employer given the fact his supervisor never responded to his question as to whether he should attend and Trimble's HR Manager said it "makes sense" for him not to attending given the pending investigation.  Facts ¶102.

**C. Even if Defendants could overcome the record evidence that suggests that they would not have taken the same adverse actions in the absence of protected activity, the record evidence suggesting pretext precludes summary judgment.**

Even if Defendants could meet the extremely high burden of showing "clear and convincing evidence" that they would have taken the same action in the absence of Mr. Tillman's protected activity, Mr. Tillman has proffered sufficient evidence of pretext.  *See Riddle v. First Tenneessee Bank, Nat. Ass'n*, 497 Fed. Appx. 588, 596-97 (6th Cir. 2012) (Analyzing whether plaintiff identified evidence to which a jury could conclude that the proffered reason is actually a pretext for unlawful discrimination); *But see Johnson v. Stein Mart, Inc.*, 440 Fed. Appx. 795, 801 (11th Cir. 2011) ("We recognize that SOX does not follow the familiar Title VII *McDonnell Douglas* burden-shifting framework.").  The record evidence of pretext discussed above, pp. 10-15 *supra*, creates a genuine issue of material fact of whether Defendants would have taken the same adverse actions in the absence of Mr. Tillman's protected activity.

**III.     There are genuine issues of material fact regarding whether Mr. Tillman was discriminated against based on his age in violation of Iowa's Civil Rights Act.**

Under the Iowa Civil Rights Act (ICRA), it is unlawful "to discharge any employee, or to otherwise discriminate" against an employee based on their age.  Iowa Code § 216.6(1)(a). Because Mr. Tillman lacks direct evidence of age discrimination, his ICRA claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Severe v. O'Reilly Auto. Stores, Inc.*, 92 F.Supp.3d 892, 901-02 (N.D. Iowa 2015). Thus, if Mr. Tillman establishes a prima facie case of age discrimination, the burden shifts to Defendants to article a legitimate nondiscriminatory reason for its actions.  If Defendants meet this burden, then Mr. Tillman must demonstrate that

the proffered reason is a mere pretext for age discrimination.  *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013).

###### A.  Mr. Tillman has established a *prima facie* case of age discrimination.

Mr. Tillman was protected by the ICRA.  *Hulme v. Barrett*, 449 N.W.2d 629, 631-32 (Iowa 1989) (ICRA is age-neutral with two inapplicable exceptions for employees under eighteen and employees in apprenticeship programs).

Mr. Tillman suffered adverse employment actions.  Defendants' argument that an older employee was eventually hired to fill Mr. Tillman's position months after the termination decision was made, [DE 136 at pp. 16-17], ignores the fact that Mr. Tillman suffered other adverse employment actions before his ultimate termination.  Under the ICRA, "[c]onduct constituting a materially adverse employment action embraces a wide variety of facts. It includes subtle conduct such as depriving an employee of the opportunity to advance, as well as more obvious actions such as 'disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of probationary period.'" *Farmland Foods, Inc. v. Dubuque Human Rights Com'n*, 672 N.W.2d 733, 742 (Iowa 2003) (quoting *Channon v. United Parcel Serv., Inc.,* 629 N.W.2d 835, 862-63 (Iowa 2001)) (internal citations omitted).[27]

First, as the oldest APS account representative, Mr. Tillman had the highest quota level. Facts ¶34. The lower quota levels for younger salespeople allowed them to earn Management By Objective ("MBO") bonuses faster than Mr. Tillman.  Facts ¶34. Thus, Mr. Tillman had to reach a higher quota than the younger account representatives to receive MBO bonus compensation. Facts ¶34.  This disparate treatment in compensation is an adverse employment action.

---

[27] Thus, the ICRA protects not only discriminatory discharges, but also discriminatory adverse employment action.  *See Naylor v. Georgia-Pacific Corp.*, 875 F.Supp. 564, 574 (N.D. Iowa 1995) (analyzing the elements of a prima facie case under the ICRA include whether "the plaintiff suffered adverse employment action, *or was discharged*"). "[Defendant] seeks to frame the issue solely as a question of whether [Plaintiff] was replaced by a member or non-member of his protected class.  [Defendant] argues that because [Plaintiff]'s replacement was [in Plaintiff's protected class], [Plaintiff] cannot prove his *prima facie* case.  This argument, however, completely ignores the fact that a plaintiff may prove the fourth prong of a *McDonnell Douglas prima facie* case of employment discrimination by demonstrating that he or she was subjected to an adverse employment action while nonmembers of the plaintiff's protected class were not subjected to the same actions." *Id.* at 575-76. Defendants rely upon *Orluske* case [DE 136 at p. 17], but that court expressly recognized that it was analyzing whether the plaintiff met her prima facie burden of "show[ing] that her age was a factor *in her discharge*." *Orluske v. Mercy Medical Center-North Iowa*, 455 F.Supp.2d 900, 917 (N.D. Iowa 2006) (emphasis added).

Second, Mr. Tillman was not paid commissions under the same circumstances in which a younger salesperson, Sean Garrison, was paid. APS's General Manager described the payment to Sean Garrison as a "similar situation" to the commissions that Mr. Tillman requested payment of but was denied.  Facts ¶3.  Sean Garrison was 43 years old in 2014, approximately 16 years younger than Mr. Tillman in 2014. Facts ¶91.  In short, Mr. Tillman was treated less favorably than a substantially younger co-worker who worked in the same position and faced a "similar situation."[28]  "The similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone.  In order to rely on comparator evidence such as [Plaintiff] offers, he must prove only that the other employees were similarly situated in all relevant respects."  *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013) (internal citations and quotations omitted).  Thus, the proffered similarly situated co-worker does <u>not</u> need to have "engaged in precisely identical conduct" *Id.*

As described above, Mr. Tillman's supervisor, Scott Mellett, refused to approve of a sale opportunity presented by Mr. Tillman, but then approved of that same exact sales opportunity (under the terms negotiated by Mr. Tillman) for a younger sales person, Amy Oakley. *See* p. 6 *supra*; Facts ¶34. Additionally, in 2014, the Compensation Plans for salespersons (a.k.a. Account Representatives) were all modified to prohibit the recovery of commissions on multi-year deals, which only negatively impacted Mr. Tillman, the oldest salesperson. *See* p. 6 *supra*. Within months after Mr. Tillman complained about the unequal treatment and his concerns that he was denied commissions under circumstances in which a younger salesperson was paid in March 2014, Mr. Tillman's supervisor instructed his co-workers not to discuss business with Mr. Tillman in May or June 2014. Facts ¶105.

Mr. Tillman was separately denied his normal commission on a deal sold to California Highway Patrol.  Mr. Tillman was forced to either accept one half of his normal commission or not receive any commission at all. Facts ¶89. Mr. Tillman's young coworkers were never forced to take one half commissions. Facts ¶90.

---

[28] Sean Garrison was paid approximately $10,000 in commissions, which included commissions on deals that did not close and for deals that did close but for which Defendants could not deliver.  Facts ¶3 (S. Garrison Dep. at 91:7-16).  Mr. Garrison was paid commissions on deals where the company never collected any revenue even though his compensation plan required the collection of revenue for the payment of commissions on a particular sale.  Facts ¶3.

Moreover, Mr. Tillman was effectively kept in limbo because management knew Mr. Tillman was objecting to participation in the conduct which he reasonably believed was unlawful.  Instead of putting Mr. Tillman on leave of absence, Defendants "play[ed] the waiting game per the attorneys" by keeping Mr. Tillman employed and continuing to write him up for engaging in protected conduct. *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 864 (Iowa 2001) ("Adverse employment action can occur even when the alleged action happens to result in an increase in pay.").

Mr. Tillman has also presented sufficient record evidence of causation. Under the Iowa Civil Rights Act, the prohibited factor (here, Mr. Tillman's age) must only be a "motivating factor" in the decision. *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 982 (8th Cir. 2010) (citing *DeBoom v. Raining Rose, Inc.*, 772 N.W. 2d 1, 3 (Iowa 2009). This "motivating factor" standard is a lower burden of proof than the "but for" causation standard under the Age Discrimination in Employment Act (ADEA). *See id.* Given the comparator evidence discussed above and the close temporal proximity of Mr. Tillman's complaints in March 2014 that he was not paid for commissions in similar circumstances in which a younger coworker was paid and the various adverse actions Mr. Tillman suffered in May 2014, Mr. Tillman has met this low burden of proving age was a motivating factor in his disparate treatment.

Moreover, there is a genuine issue of material fact regarding whether Mr. Tillman was replaced by Jeff Coggins (as argued by Defendants) or John Stransky (as previously argued by Defendants). APS's General Manager, William Martin, filed an affidavit with the United States District Court for the Southern District of Iowa (before this case was transferred). Mr. Martin's affidavit stated: "Tillman's sales territory was taken over by John Stransky…."[29] Defendants' Motion admits that John Stransky replaced Plaintiff after April 2014 through September 2014. [DE 136 at p. 17, n. 4]. John Stranksky was hired in June 2014, which is after the record evidence shows Mr. Tillman indicated a willingness to go on administrative leave pending the results of the investigation in April 2014 (Facts ¶27), after the "separation" decision had already been made in April 2014, and after internal communications prove that Defendants were "play[ing] the waiting game" regarding Mr. Tillman's termination announcement. *See* pp. 12-13 *supra* (record evidence shows inexplicable delay in termination proceedings).  Thus, even Mr. Tillman's ICRA claim was based solely upon his discharge and thus required that he prove he

---

[29] Facts ¶¶28-30.

was replaced by a younger employee, there is a genuine issue of material fact regarding whether John Stransky replaced Mr. Tillman.[30]

> **B.     Even if Defendants' proffered legitimate business reason is unrelated to Plaintiff's age, Mr. Tillman can proffered record evidence establishing pretext.**

As described above, there are at least eight (8) independent pieces of record evidence that create a fact issue regarding whether the adverse employment actions suffered by Mr. Tillman were pretextual. *See* pp. 10-16 *supra*.[31]   Mr. Tillman's evidence of pretext should not be independently scrutinized in a vacuum, but instead viewed as a whole. When "[t]aken together, [Mr. Tillman]'s evidence is sufficient to allow a rational factfinder to find that [Defendants'] proffered reasons for terminating him were pretextual." *Ridout v. JBS USA, LLC*, 716 F.3d 1079,

---

[30] Even ignoring the record evidence of the inexplicable delay, Defendants' argument that Plaintiff was not "replaced" by John Stransky because John Stransky was an existing employee at the time of Plaintiff's official termination has been previously rejected by Courts. *Hrapkiewicz v. Wayne State University Board of Governors*, 2017 WL 947604 (Mich. App. March 9, 2017) (defendant employer was not entitled to summary judgment on claim under Michigan's state anti-discrimination statute because the plaintiff satisfied the element of a prima facie case of being replaced by younger employee by proffering evidence that a younger employee was "reassigned" to assume the majority of the plaintiff's duties); *Movsisyan v. IPAX Cleanogel, Inc.*, 2013 WL 2494979, *4-5 (Mich. App. June 11, 2013) (plaintiff satisfied *prima facie* element of replacement by younger person in age discrimination discharge case where an existing employee younger than plaintiff performed some of plaintiff's work responsibilities before a more permanent replacement was hired).

[31] Defendants only proffered legitimate nondiscriminatory reasons for Mr. Tillman's ultimate termination and the setting of his quotas.  [DE 136 at pp. 8-12, 19.]  However, Defendants' Motion does <u>not</u> provide a legitimate nondiscriminatory reason for the other adverse actions, including (1)  his supervisor instructing his co-workers not to discuss company business with him in May or June 2014; (2) his supervisor refusing to approve of a sale (which he later approved of on the same terms for a younger employee who had not engaged in protected conduct); (3) the change in compensation policy that only negatively impacted Mr. Tillman's employment; or (4) the reduction or non-payment of Mr. Tillman's commissions. *See* pp. 5-6. *supra*. Because Defendants did not meet their burden within their Motion and cannot raise new issues in their Reply, Mr. Tillman's inference of discrimination created by Mr. Tillman's prima facie case has remained unrebutted as to those actions and summary judgment must be denied as to Mr. Tillman's claims under the FWA and the ICRA. *See Gross-Jones*, 874 F.Supp.2d at 1341-42 (Denying summary judgment and refusing to engage in pretext analysis where defendant did not proffer legitimate non-discriminatory reasons for each of the adverse actions raised by the plaintiff.).

1086 (8th Cir. 2013).[32] Mr. Tillman's record evidence of inconsistencies as to who made the decision to terminate his employment and whether that decision was made months before it was announced is sufficient to establish pretext to preclude summary judgment under the ICRA. *Severe*, 92 F.Supp.3d at 903-04 (denying summary judgment on ICRA claim and holding that "any evidence allowing an inference that the termination decision was actually made prior to November 29, 2012, would contradict O'Reilly's position and cast doubt on its explanation").

Moreover, Defendants' failure to inform Mr. Tillman that "insubordination" was one of the purported reasons for his termination (until proffered in this litigation) also serves as evidence of pretext under the ICRA. *Barkoff v. Bossard North America, Inc.*, 684 F.Supp.2d 1096, 1113-14 (N.D. Iowa 2010) (denying summary judgment on ICRA claim in part based on defendant's failure to inform plaintiff that her "attitude" was the real reason for her termination).

Under the ICRA, "[t]he employee may demonstrate pretext by showing that 'it was not the employer's policy or practice to respond to such problems in the way it responded to plaintiff's case.'" *Ridout*, 716 F.3d at 1084 (quoting *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 726 (8th Cir. 2001)). Thus, the record evidence that the decision to terminate Mr. Tillman's employment was a "non-standard process" and that Defendants did not follow Trimble's progressive discipline policy is further evidence of pretext. *See* pp. 9, 13 *supra*.

Mr. Tillman has establish a prima facie case of age discrimination under the ICRA. Defendants have not proffered a legitimate nondiscriminatory reason for several of the adverse actions suffered by Mr. Tillman, and Mr. Tillman has proffered evidence of pretext to rebut Defendants' proffered legitimate nondiscriminatory reason for the setting of his quotas and his ultimate termination. Thus, summary judgment should be denied on his ICRA claim (Count IV).

## IV. There are genuine issues of material fact regarding whether Defendants breached their contractual obligations to Mr. Tillman.

Mr. Tillman's claim for breach of contract is based upon (1) APS's breaches of the 2004 Representative Agreement and (2) Defendants' breaches of the 2012, 2013, and 2014 Compensation Plans. Only the 2004 Representative Agreement with APS has a choice of law

---

[32] Because Mr. Tillman has presented evidence in the record that shows Defendants' reasons are "unworthy of credence," a "trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

provision requiring the application of Florida law. Thus, Iowa law should be applied to the Compensation Plans as discussed further below.

### A. APS breached the Representative Agreements by failing to provide Mr. Tillman with monthly commission statements, failing to collect revenue from customers, and failing to pay Mr. Tillman commissions.

Defendants concede that they did not provide Mr. Tillman with commission statements. [DE 136 at p. 20.]  Failing to provide monthly commission statements is a breach of Section 2.4 of the 2004 Representative Agreements between Mr. Tillman and APS, which unambiguously provides: "APS shall provide to Representative monthly statement showing total billings for commissionable or otherwise compensable Product sales."  Facts ¶37, 38. Defendants instead argue that the breach is immaterial as a matter of law.  [DE 136 at pp. 20-21.]  However, "[w]hether or not an alleged breach is material is a question of fact to be resolved by the trier of fact." *Britt Green Trucking, Inc. v. FedEx Nat., LTL, Inc.*, 2014 WL 3417569, at *6 (M.D. Fla. July 14, 2014). The undisputed evidence is that Defendants did <u>not</u> provide the monthly commission statements. Facts ¶93. There is record evidence that this breach was material as Mr. Tillman could not determine whether APS had paid him all of the commissions he was owed. Facts ¶93. APS also failed to pay Mr. Tillman commissions on the DuPage County Circuit Clerk - Professional Services - documentation project in 2011, which is a breach of Section 2.3 of the 2004 Representative Agreement as amended. Facts ¶35.

Defendants attempt to argue that commissions were not owed to Mr. Tillman because "No revenue was received by APS" [DE 136 at p. 21.] However, APS had an affirmative contractual obligation within Section 2.5 of the 2004 Representative Agreement to collect that revenue after Mr. Tillman made the sale on APS's behalf. Facts ¶¶38-39. APS failed to collect revenue from customers to which Mr. Tillman sold APS products. Facts ¶¶ 44-51. This is a breach of Section 2.5.  Moreover, this unreasonable and unfair action breached the implied covenant of good faith and fair dealing. *Vlieger v. Farm for Profit, Research & Dev., Inc.*, 705 N.W.2d 339 (Iowa Ct. App. 2005) ("Every contract contains an implied covenant of good faith and fair dealing.").Defendants should not be permitted to refuse to pay Mr. Tillman because they failed to deliver or collect revenue on the products their authorized salesperson sold to customers before his unlawful termination.

**B.      Defendants breached the Compensation Plans by failing to pay Mr. Tillman commissions.**

The provisions within the Compensations Plans that Mr. Tillman would not be paid commissions where the customer does not pay for the goods or services sold by Mr. Tillman are unlawful and unenforceable under Iowa law.  The Iowa Wage Payment Collection Law provides: "The following **shall not** be deducted from an employee's wages: … c. Losses due to breakage, damage to property, default of customer credit, or **nonpayment of goods or services rendered so long as such losses are not attributable to the employee's willful or intentional disregard of the employer's interests.**"  Iowa Code §91A.5(2) (emphasis added).

This Iowa law conflicts with Florida law. Because there is a true conflict of law, the Court should conduct a choice of law analysis.

> In the case of contract, Florida follows the conflicts of laws rule that the United States Supreme Court established in *Scudder v. Union Nat'l Bank,* 91 U.S. 406, 23 L.Ed. 245 (1876), which holds that in cases where the place of making the contract and performing it are not the same, then the laws of the place in which it was made shall govern matters of execution, interpretation and validity. *Id.* at 411. The Florida Supreme Court follows this rule. *See Sturiano v. Brooks,* 523 So.2d 1126, 1129–1130 (Fla.1988).

*In re Estate of Nicole Santos*, 648 So. 2d 277, 280 (Fla. 4th DCA 1995). "A contract is made at the location of the last act necessary to create a contract." *Hendricks v. Smartvideo Techs., Inc.*, 511 F. Supp. 2d 1219, 1226 (M.D. Fla. 2007).  Mr. Tillman signed the Compensation Plans and accepted Defendants' offers while in Iowa.  Thus, the contracts were formed in Iowa. Facts ¶111. Moreover, Mr. Tillman performed many of his obligations under the contract while in Iowa. Facts ¶111.[33] Thus, Iowa law applies to the interpretation and validity of the 2012-2014 Compensation Plans. *See In re Estate of Nicole Santos*, 648 So. 2d at 280.

Under Iowa law, Defendants cannot lawfully refuse to pay Mr. Tillman wages due to customers' nonpayment of goods or services rendered so long as such losses are not attributable to Mr. Tillman. Iowa Code §91A.5(2).[34]  The undisputed facts show that if revenue was not

---

[33] Mr. Tillman also received compensation from Defendants in Iowa, covered Iowa and the Midwest as part of his sales territory for APS and Trimble, and engaged in sales activity within the State of Iowa on Defendants' behalf. Facts ¶111.

[34] Commissions are "wages" for purposes of Iowa law.  *Miller v. Component Homes, Inc.*, 356 N.W.2d 213, 216 (Iowa 1984) ("'Wages' are defined as 'compensation owed by an employer

collected by Defendants from customers on the unpaid commissions claimed by Mr. Tillman, then that the nonpayment was <u>not</u> attributable to Mr. Tillman. Facts ¶¶44-51. Accordingly, Defendants cannot rely on contractual language that purports to limit Defendants' obligation to pay Mr. Tillman commission only to deals where clients do *not* refuse to pay.  As a result, there are genuine issues of material fact as to whether Defendants owe Mr. Tillman commissions (which were never paid to Mr. Tillman) on the following projects under the 2012 Compensation Plan (Madison County Circuit Court and City of Rockford); under the 2013 Compensation Plan (DeKalb County Circuit Court - annual maintenance; Cook County - Annual Maintenance; Vermilion Circuit Court; Moltier Circuit Court); and under the 2014 Compensation Plan (DuPage County Circuit Clerk monthly commission). Facts ¶35.[35]

After Mr. Tillman negotiated and booked the sale with company approval in 2010, Defendants cancelled the project with Madison County Circuit Court in August 2012 and refused to pay Mr. Tillman for his already performed work. Facts ¶88. Similarly, after Mr. Tillman negotiated and booked the sale with company approval in 2010, Defendants cancelled the project with the City of Rockford, Illinois in July 2012 and charged back Mr. Tillman the commission of $28,094 because APS was sued for failing to deliver the product (even though Mr. Tillman had already performed his work and the lawsuit had nothing to do with Mr. Tillman's conduct). Facts ¶35. Additionally, Defendants breached the 2013 Compensation Plan by improperly reducing the amount recorded for the DuPage County 2013 project from $2.75 million to $2.25 million in violation of the purchase order guidelines. Facts ¶35. This reduction of $500,000 resulted in

---

for: a. Labor or services rendered by an employee, whether determined on a time, task, piece, commission, or other basis of calculation.'") (quoting Iowa Code §92A.2(2) (now §92A.2(4)).

[35]   Even assuming *arguendo* that the provision allowing Defendants to reduce Mr. Tillman's wages due to nonpayment by the customers was enforceable under Iowa law, that provision was modified by oral statements by Defendants (see pp. 29-30 *infra*.) and the parties' course of dealings. *Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) ("Long ago we abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract."). Under Iowa law, any determination of the meaning or interpretation of a contract "should only be made in light of relevant evidence of the situation and relations of the parties … and the course of dealings between the parties." *Id.* (quoting *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999)). The course of dealings between Mr. Tillman and Defendants included promises to pay Mr. Tillman despite Defendants' struggles to deliver products or services to customers and payments of commissions to Mr. Tillman before revenue was received on a particular sale. Facts ¶¶36, 41-42, 53-55. Thus, this question of interpretation should be determined "by the finder of fact." *Pillsbury Co., Inc.*, 752 N.W.2d at 436.

damages to Mr. Tillman as if this project was recorded in the amount of the purchase order, Mr. Tillman would have received a 5% Management By Objective (MBO) payment of $25,000. Facts ¶35.

Defendants' argument that Mr. Tillman forfeited earned commissions  is also contrary to Iowa law.[36] The Supreme Court of Iowa has held that a forfeiture requires the party seeking a forfeiture to show that the "equities are clearly on their side" and that there is an "absence of a statute declaring void" the type of provision at issue. *Van Hosen v. Bankers Trust Co.*, 200 N.W.2d 504, 508 (Iowa 1972). Here, the provision is void as Iowa Code §91A.5 prohibits the reduction of Mr. Tillman's commissions based upon a customer's nonpayment of good or services. Moreover, the equities are not in Defendants' favor. Amy Oakley testified that she received a commission on a deal on terms that were negotiated by and presented to Trimble by Mr. Tillman during his employment. Facts ¶108. Defendants also wrongfully terminated Mr. Tillman's employment. *Cf. Rabe v. Rudolph Wurlitzer Co.*, 43 F.Supp. 416, 417 (S.D. Fla. 1942) (Enforcing limitation on commissions earned but recognizing that "If the contract had been wrongfully terminated, thus wrongfully preventing a performance by the plaintiff, a wholly different question would be presented."). Defendants also hindered performance by refusing to deliver the agreed upon products or services sold by Mr. Tillman to list customers. Facts ¶¶35, 44-51.

## V.   There are genuine issues of material fact regarding Mr. Tillman's promissory estoppel claim.

Defendants argue that summary judgment should be granted on Mr. Tillman's promissory estoppel claim because an express contract exists.  While this argument is based upon a correct statement of Florida law, it can be rejected for several reasons.

First, as the title implies, the 2012-2014 Compensation Plans only address Mr. Tillman's compensation.  They do not address other issues relating to his employment, responsibilities,

---

[36]  The forfeiture provision is also illusory and unenforceable under either Iowa or Florida law. Under Defendants' logic, they could refuse to pay an employee any wages for an entire year, and then wrongfully terminate the employee and point to the limitation of liability provision as the reason why the employee is not due a minimum wage under applicable law. Such a provision is contrary to Florida and Iowa law, which both expressly provide for statutory protection for employees whose employers refuse to pay them lawfully earned commissions. *See* Fla. Stat. § 448.08; Iowa Code § 91A.8.

expectations and sales territory, which also form the basis of his promissory estoppel claim. Second Am. Compl. [DE 102 at ¶52]; Facts ¶¶ 36, 41-42, 52-55.

Second, genuine issues of material fact remain regarding whether all of the provisions of the 2012-2014 Compensation Plans are valid and enforceable under applicable law. Facts ¶36, 41-42, 53-55. As explained above, issues remain regarding the enforceability of the provisions (1) that purport to reduce Mr. Tillman's wages based on the nonpayment of a customer even when that nonpayment is not attributable to Mr. Tillman and (2) require a forfeiture of commissions earned by Mr. Tillman.

Third, to the extent Mr. Tillman's promissory estoppel claim relies upon promises made as to the payment of commissions to Mr. Tillman, there is a genuine issue of material fact regarding whether Mr. Tillman's reliance was "justified" despite the terms of the written Compensation Plans. *See Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726 (Iowa 2009) (whether plaintiff's reliance was "justifiable" was a fact issue despite written contract terms). Under Iowa law, Mr. Tillman "must demonstrate justifiable reliance on the defendant's promise, representation, or concealment of material facts." *Bruns v. Hartford Acc. & Indem. Co.*, 407 N.W.2d 576, 580 (Iowa 1987).

Jack Siney and Erin Quinn promised Mr. Tillman that "he would get paid" despite Defendants' problems delivering on products or services sold by Mr. Tillman. Facts ¶36, 41-42, 52-55.[37] Mr. Tillman justifiably relied on those promised by continuing to sell products on Defendants' behalf with the expectation that he would be paid, even if Defendants were unable to deliver products or services or if customers refused to pay Defendants. Facts ¶36, 41-42, 52-55. This fact issue precludes summary judgment on Mr. Tillman's promissory estoppel claim.

## CONCLUSION

For the foregoing reasons, Mr. Tillman respectfully requests the Court deny Defendants' Motion for Final Summary Judgment.

---

[37] "[T]he law governing summary judgment is quite indulgent of non-movants' testimony." *Fini v. Dish Network, L.L.C.*, 955 F.Supp.2d 1288, 1293 (M.D. Fla. 2013). Generally, "a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Feliciano v. City of Miami Beach*, 707 F.3d 1233, 1253 (11th Cir. 2013).

/s/ *Roger W. Feicht*
G. Joseph Curley
Florida Bar No. 0571873
Email: gcurley@gunster.com
Roger W. Feicht
Florida Bar No. 84982
E-mail:  rfeicht@gunster.com
Gunster, Yoakley & Stewart, P.A.
777 S. Flagler Drive, Suite 500 East
West Palm Beach, FL  33401
Telephone:  (561) 655-1980
Facsimile:  (561) 655-5677
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2017, I electronically filed the foregoing Motion to Compel with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified below via transmission of Notices of Electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ *Roger W. Feicht*
ROGER W. FEICHT

## SERVICE LIST
*Kim Peter Tillman v. Advanced Public Safety, Inc. and Trimble Navigation, Ltd.*
Case No. 15-81782-CIV-MARRA

Kelly Charles-Collins, Esq.
William G.K. Smoak, Esq.
Smoak, Chistolini & Barnett, PLLC
320 W. Kennedy Blvd., 4th Floor
Tampa, FL 33606
kcollins@flatrialcounsel.com
courtdocuments@flatrialcounsel.com
*Counsel for Defendants Advanced Public Safety, Inc. and Trimble, Inc.*

WPB_ACTIVE 7710690.2